CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 3 0 2004

JOHN F. CORCORAN, CLERK
BY:
　　DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| RUSSELL ADAM PELLETIER, | )<br>) |
| Plaintiff, | ) Civil Action No. 7:02CV00828<br>) |
| v. | )<br>) |
| BONITA BERRY, KENNETH BILLER, ANTHONY CLATTERBUCK, WHITNEY COLEMAN, MICHAEL GARRISON, BOBBY HARDISON, MELBA JONES, ROY JONES, STEVEN KEYS, JACK MCKEEN, and CLARENCE LEWIS, | ) <br>) MEMORANDUM OPINION<br>)<br>)<br>)<br>)<br>) By. Hon. James C. Turk<br>) Senior United States District Judge |
| Defendants. | ) |

Plaintiff Russell Adam Pelletier, ("Pelletier"), a Virginia inmate proceeding *pro se*, brings this action under the Civil Rights Act, 42 U.S.C. §1983, with jurisdiction vested under 28 U.S.C. §1343. In his complaint, Pelletier alleges that while he was incarcerated at Central Virginia Regional Jail, ("CVRJ"), the Defendants Bonita Berry, ("Berry"), Kenneth Biller, ("Biller"), Anthony Clatterbuck, ("Clatterbuck"), Whitney Coleman, ("Coleman"), Michael Garrison, ("Garrison"), Bobby Hardison, ("Hardison"), Melba Jones, Roy Jones, Steven Keys, ("Keys"), Jack McKeen, ("McKeen"), and Clarence Lewis, ("Lewis") violated Pelletier's constitutional rights under the Eighth Amendment by subjecting him to the use of excessive force and acting with deliberate indifference to a substantial risk to his health or safety. The complaint seeks a declaratory judgment against Defendants and compensatory damages in the amounts of $8,000,000 from CVRJ, $300,000 from Hardison and Roy Jones, $200,000 from Berry, Clatterbuck, Coleman, Garrision, Keys, Lewis, McKeen, and $100,000 from Melba Jones and

Biller.

## I. Facts

Pelletier was incarcerated at CVRJ during the events described in his complaint. In sum, Pelletier alleges several incidents in which he was subjected to the use of excessive force by CVRJ officers.

Pelletier's first claim arises from an incident on January 27, 2001 and involves Defendants Biller, Coleman, Hardison, Melba Jones, and McKeen. Pelletier claims that he was beaten, punched, and shocked for no apparent reason. CVRJ records and affidavits produced by the defendants indicates that on January 27, 2001, CVRJ guards approached Pelletier's cell in response to noises coming from the cell. Pelletier was found to be kicking his cell door in an effort to beckon someone to bring him a telephone. Coleman, a CVRJ guard, told Pelletier that she would fulfill his request. However, Pelletier did not stop kicking his cell door, which is a violation of CRVJ's rule of acceptable standards of inmate behavior. Coleman instructed other guards to remove Pelletier's personal property from his cell as a punishment for his misbehavior. The guards requested Pelletier to submit to handcuffs and leg irons and he consented. When the officers entered Pelletier's cell to remove his property, Pelletier started to yell and curse at them and began kicking his cell door again. Coleman was drawn back to Pelletier's cell by the commotion and explained to Pelletier why he was being punished. The officers finished removing Pelletier's property and exited his cell. Before the cell door closed, Pelletier approached the door and yelled "bitch ass" at Coleman; using vulgar language toward staff is also prohibited under CRVJ rules. Coleman reentered Pelletier's cell to restrain Pelletier in order to transport him to the booking area where Pelletier would be housed while CVRJ decided how

to punish him for the new violation. Pelletier refused Lt. Coleman's order to stand facing the cell wall and resisted her efforts to restrain him. Force was applied by Coleman, Biller, and Jones to subdue Pelletier which resulted in Pelletier's fall to the floor. Pelletier continued to resist the officers' efforts and tried to hide from them under his bunk. Coleman needed extra help, so McKeen and Hardison responded. With Pelletier successfully fending off the efforts of several officers, McKeen applied and activated his Ultron unit on Plaintiff's lower right side. Pelletier continued to resist the officers, so McKeen activated the Ultron unit a second time, after which Pelletier stopped resisting and was restrained. The medical department examined Pelletier that day and found that he had electric signature marks on his left and right posterior flanks, but no other injuries were noted and Pelletier presented no further complaints.

Pelletier's second claim arises from an incident from June 5, 2001 and involves Defendants Clatterbuck and Lewis. Pelletier claims that Lewis pulled him from the floor of his cell and threw him against a wall. On that date, Clatterbuck and Lewis were assisting other officers in a headcount of Pelletier's cell block. When the officers arrived at Pelletier's cell block they instructed him to stand for the headcount. Pelletier states that he stood for the count. The officers recount that he stood for a brief time and then retired to his bed before being counted. The officers explained to Pelletier that he needed to stand up again. In response, Pelletier cursed the guards and disobeyed their order by refusing to stand up. Lewis then entered Pelletier's cell and instructed him to stand up. Again, Pelletier refused. Lewis grasped Pelletier by the right arm, stood him up, and handcuffed him behind his back as he yelled at and cursed the officers. Lewis charged Pelletier with an institutional violation of failure to follow institutional count procedures; Pelletier was found guilty. On June 5, 2001, Pelletier was seen in

the medical department by the doctor, who made no observations other than chronic back pain.

Pelletier's third claim is based on an incident from July 15, 2001. Officers Biller and Keys were conducting a search of cells and re-assignment of inmates in the segregation area in which Pelletier was housed. Biller and Keys arrived at Pelletier's cell and instructed him to pack his belongings in preparation for a search of his cell. The officers states that Pelletier responded by yelling at and cursing the officers and by telling them to leave him alone; Pelletier admits he argued with the officers. Keys told Pelletier to be quiet and instructed him to face the wall so that he could be handcuffed before his upcoming move. Pelletier apparently refused Keys's instructions. Lt. Wright came to the area and spoke with Pelletier, who then calmed down. After moving Pelletier to another cell, the officers instructed him to back up to his cell door so that the officers could remove the handcuffs. Pelletier refused that instruction also, necessitating another visit from Lt. Wright. After speaking with Lt. Wright, Pelletier again calmed down and the handcuffs were removed. Pelletier states that during this incident, Keys entered Pelletier's cell, started an argument with Pelletier, and then punched Pelletier in the throat. Pelletier claims that he received a second punch in the throat in response to his complaints about the first punch. After Pelletier complained about being punched, he was evaluated in the medical department. The report from the medical department reflects that no injuries to Pelletier's neck were observed and Biller denies that Keys ever struck Pelletier.

Pelletier's fourth claim involves an incident from August 24, 2001, while Pelletier was being held in the CVRJ segregation unit. In his complaint, Pelletier claims that Defendant Berry came to the unit to get Pelletier for a visit. He claims that she shackled his feet too tightly to allow Pelletier to walk, denied his repeated requests to loosen the shackles, and then tried to drag

Pelletier out of the cell as Pelletier screamed in pain. Berry responded by affidavit. She confirms that she went to Pelletier's cell to produce him for a visit and that she shackled his ankles before attempting to escort him to his visitor. CVRJ has a jail policy of ensuring the shackles are not applied too tightly. Pursuant to this policy, Berry states that she checked the shackles to ensure they were not too tight by placing two fingers between the shackles and Pelletier's legs "without difficulty." Pelletier complained that they were too tight, and Berry responded by telling him that they were applied according to CVRJ policy. She suggested that Pelletier try to walk and tell her if the shackles still felt too tight. Pelletier responded by cursing at Berry and demanding that she loosen the shackles, a demand Berry refused. Pelletier again cursed at Berry, who decided that Pelletier could not be taken to the visitation area based on his behavior. She exited his cell and demanded that Pelletier back up to the door so the shackles could be removed. Pelletier remained defiant and Berry needed to return with two more officers who were then able to remove the shackles. Pelletier was charged with violating CVRJ's policy against using vulgar language toward staff, to which he pleaded guilty.

Finally, on October 17, 2001, Pelletier claims that Defendant Clatterbuck was deliberately indifferent to a serious risk of substantial harm caused by Defendants Jones and Garrison. Pelletier claims that he was busy with his legal work when Defendants Jones and Garrison came to escort him to segregation. Pelletier says that when he complained about having to work, he was pushed into a wall and choked on a candy bar. Pelletier states that he coughed and projected the candy bar out to his side before Jones and Garrison tackled him to the floor and Jones punched him in the head. Jones and Garrison allegedly shackled Pelletier and dragged him down the hall while Clatterbuck watched and did nothing.

Jones, Garrison, and Clatterbuck have responded by way of affidavits. They state that when Officers Wilson and Clatterbuck attempted to escort Pelletier to segregation, he began to argue loudly about what property he could take to segregation, which attracted the attention of Officers Jones and Garrison. Garrison then entered Pelletier's cell and took him out into the hall while Clatterbuck and Wilson began to gather Pelletier's property. The officers handcuffed Pelletier and attempted to escort him down the hall to segregation. Pelletier then refused to enter the doorway leading to the segregation unit and tried to break free from the officers. Jones grasped Pelletier's arm and he and Garrison led Pelletier through the doorway. However, Pelletier then spit the candy bar he was eating onto Jones. In response, Garrison attempted to place Pelletier against the wall of the hallway. Pelletier then dropped his shoulder, crouched down, balled his fists, and struck Jones in the groin. At this point, the officers took Pelletier to the floor, restrained him with leg irons, and carried him to segregation.

## II. Standard of Review

### Summary Judgment

Upon motion for summary judgment, the court must view the facts, and the inferences to be drawn from those facts, in the light most favorable to the party opposing the motion. Ross v. Communications Satellite Corp., 759 F.2d 355 (4th Cir. 1985). Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Federal Rule of Civil Procedure 56(c) mandates entry of summary judgment against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex v. Catrett, 477 U.S. 317,

322 (1986). However, the moving party is not entitled to summary judgment if the parties dispute over a material fact is "genuine." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. Id. When a motion for summary judgment is made and properly supported by affidavits, depositions, or answers to interrogatories, the non-moving party may not rest on the mere allegations or denials of the pleadings. Instead, the non-moving party must respond by affidavits or otherwise present specific facts showing that there is a genuine issue of disputed fact for trial. Fed. R. Civ. P. 56(e). While the court must construe factual allegations in the non-moving party's favor and treat them as true, the court need not treat the complaint's legal conclusions as true. Estate Constr. Co. Miller & Smith Holding Co., 14 F.3d 213, 217-18 (4th Cir. 1994). Summary judgment appropriately lies for the movant only if there can be but one reasonable conclusion drawn from the evidence, against the non-moving party. Anderson, 477 U.S. at 247-48. Where the plaintiff appears *pro se*, the complaint is held to less stringent standards than formal pleadings drafted by attorneys. Hughes v. Roe, 449 U.S. 5, 9 (1980).

**Plaintiff's Eighth Amendment Claims**

*Excessive Use of Force*

In the context of prisoners, the Eighth Amendment's Cruel and Unusual Punishment Clause prohibits the "unnecessary and wanton infliction of pain". Whitley v. Albers, 475 U.S. 312, 319 (1986). The Supreme Court has articulated a two-pronged test to determine when the infliction of pain is unnecessary and wanton. The first prong, the "objective component," asks

whether the defendants' conduct was objectively "harmful enough" to establish a constitutional violation. Hudson v. McMillian, 503 U.S. 1, 8 (1992). The second prong, the "subjective component," asks whether the defendants acted with a "sufficiently culpable state of mind;" that is, whether "force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Id. at 7-8.

Defendants cite Norman v. Taylor, 25 F.3d 1259 (4th Cir. 1994), for the proposition that in excessive force cases,"*de minimis* injury can serve as conclusive evidence that *de minimis* force was used." Norman involved a prisoner suit against a corrections officer who swung a set of keys at an inmate, injuring his thumb. The Fourth Circuit found that because Norman alleged only *de minimis* injury– a sore thumb– he could not state an Eighth Amendment claim. Id. at 1263-64. Norman's medical records contained no objective manifestations of injury, but also did not record even any complaints of pain. Thus, in Norman, summary judgment for the defendants was appropriate.

*Deliberate Indifference*

Pelletier has alleged that Defendant Biller acted with deliberate indifference to a substantial risk of harm during the time Pelletier claims he was beaten by Defendant Keys. To establish a claim against Biller under the Eighth Amendment based on deliberate indifference, Pelletier must establish two elements. First, the deprivation alleged "must be, objectively, 'sufficiently serious.'" Farmer v. Brennan, 511 U.S. 825, 834 (1994). "[T]o demonstrate such an extreme deprivation, a prisoner must allege a serious or significant physical or emotional injury resulting from the challenged conditions or demonstrate a substantial risk of such serious harm

resulting from the prisoner's exposure to the challenged conditions." De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003). Second, a prisoner must present evidence that the prison officials had a " 'sufficiently culpable state of mind.'" Farmer, 511 U.S. at 834. "When an inmate challenges the conditions of his confinement under the Eighth Amendment, the requisite state of mind is one of 'deliberate indifference' to inmate health or safety." Id. A prison officer demonstrates deliberate indifference if he or she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837.

### III. Discussion

*Claim 1: The January 27, 2001 Incident*

Because the Court concludes that Pelletier has presented a genuine dispute as to material fact requiring trial on this claim, the motion for summary judgment by Defendants Biller, Coleman, Hardison, Melba Jones, and McKeen, must be denied as to Count 1 of the Amended Complaint.

*Claim 3: The June 5, 2001 Incident*

Defendants Clatterbuck and Lewis are alleged to have assaulted Pelletier on June 5, 2001, during a headcount of inmates. Pelletier states simply that Lewis entered Pelletier's cell, yanked him up, and threw him against a wall. After this incident, Pelletier was examined in the medical department by the doctor, who made no findings except for chronic back pain, for which Pelletier was provided medication. Pelletier submitted an "[A]ffidavit of physical and psychological

damage" in which he asserts that he suffered "sore fingers and wrist" and "days of pain" from the defendants' alleged misuse of force.

The Court concludes that there is no genuine issue of material fact for trial on this claim because Pelletier cannot establish the objective prong of the standard for claims of excessive use of force under the Eighth Amendment. The injuries Pelletier claims to have suffered consist only of *de minimis* injuries, sore fingers and a sore wrist. *De minimis* injuries serve as evidence that *de minimis* force was used. Norman, 25 F.3d 1259, 1263-64 (4th Cir. 1994). The Court finds that neither of these injuries rise above the *de minimis* threshold. Therefore, Defendants Clatterbuck and Lewis are entitled to summary judgment as to Claim 3 of the Amended Complaint.

*Claim 4: The July 15, 2001 Incident*

Keys allegedly punched Pelletier twice in the neck during a search and reassignment of inmate cells on July 15, 2001. Pelletier has provided an affidavit from Bobby Patterson which supports Pelletier's version of the incident. Keys denies striking Pelletier and Biller denies that Keys struck Pelletier. After Pelletier began to complain that he had been struck, the CVRJ medical center examined Pelletier's neck. Pelletier alleges that he suffered a "severe sore throat" as a result of Key's alleged actions. The nurse's notes reflect that no injuries to Pelletier's neck were found.

The Court concludes that Pelletier has failed to present a genuine issue of material fact for trial on this claim because he cannot satisfy the objective prong of the excessive force standard under McMillian, 503 U.S. at 8. The Court finds that a sore throat is akin to a sore thumb, an injury found by the Fourth Circuit in Norman to be insufficient to state a claim under the Eight

Amendment. As Pelletier has established no more than a *de minimis* injury, he fails to establish that Officers Biller and Keys used more than *de minimis* force and his Eighth Amendment claims fail accordingly. See Norman, 25 F.3d at 1263-64. Therefore, the Court grants summary judgment for Defendants Biller and Keys as to Claim 4 of the Amended Complaint.

### Claim 7: The August 24, 2001 Incident

Pelletier claims that Berry applied leg irons that were so painfully tight that they "started to cut the circulation of blood" to his legs. Berry then allegedly "tried to drag the Plaintiff out of the cell by his arms" while he "complained and screamed about the leg irons." In addition to his own recollection of the event, Pelletier provided an affidavit from Bobby Patterson which mirrors Pelletier's version of the facts.

The Court concludes that there is no genuine issue of material fact for trial on this claim because Pelletier cannot satisfy either the objective or subjective prong of the standard for claims of excessive use of force under the Eighth Amendment. First, the injuries Pelletier claims to have suffered are no more than *de minimis* injuries, which serve as evidence that *de minimis* force was used. Pelletier alleges only that the leg irons hurt his ankles and that his circulation was temporarily "cut off." In his "[A]ffidavit of physical and psychological damage," Pelletier alleges that he "still suffer sore ankles on a regular basis" because of the alleged actions of Berry, but he provides no evidence to support a causal relationship between Berry's actions and his pain. The Court finds that neither of the alleged injuries from this incident rise above the *de minimis* threshold and cannot support a claim under the Eighth Amendment. Norman, 25 F.3d at 1263-64. The Court also finds no dispute as to whether Berry applied the leg irons according to

CVRJ policy in a good faith effort to maintain order while she escorted Pelletier to his visitor. Therefore, the Court grants summary judgment to Defendant Berry on Claim 7 of the Amended Complaint.

*Claim 12: The October 17, 2001 Incident*

In connection with the October 17, 2001 incident, Pelletier claims that Roy Jones and Garrison used excessive force when escorting him to segregation and asserts that Clatterbuck was deliberately indifferent to a serious risk of substantial harm as he watched the incident. Pelletier asserts that during a headcount, Jones and Garrison instigated this incident without provocation by tackling Pelletier against a wall, taking him to the floor, and then punching him in the head while Clatterbuck stood watching nearby.

After viewing the evidence in the light most favorable to Pelletier, the Court concludes that he has failed to present a genuine issue of material fact for trial on this claim because he fails to satisfy the objective prong of the standard for Eighth Amendment claims for the excessive use of force. The nurse's examination notes from October 17, 2001 indicate "no broken skin," but did note "redness on both wrists and a small red area" of the right side of his head. Pelletier alleges that he still suffers sore ankles as a result of the actions of Jones and Clatterbuck, but he provides no evidence to support a causal connection between the defendants' actions and his pain. The Court finds these injuries to be *de minimis* and insufficient to form the basis of an Eighth Amendment claim. Norman, 25 F.3d at 1263-64. Therefore, the Court grants summary judgment to officers Jones, Garrison, and Clatterbuck on this claim.

## IV. Conclusion

Based on the foregoing, the Court grants summary judgment to Defendants on all claims of the Amended Complaint except for Claim 1, alleging the use of excessive force by Defendants Coleman, Hardison, McKeen, and alleging deliberate indifference to a serious risk of substantial harm by Defendants Biller and Melba Jones. An appropriate Order shall be issued this day.

The Clerk is directed to send certified copies of this Memorandum Opinion and accompanying Order to plaintiff and counsel of record for the defendants.

ENTER: This 30th day of March, 2004.

                                            */s/ James C. Turk*
                                    Senior United States District Judge